IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ANTHONY H. TURNER,

Plaintiff,

v.                                                                OPINION and ORDER

RANDALL HEPP, LUDWIG, CANDACE WHITMAN,                            19-cv-431-jdp
DYLON RADTKE, L. BARTOW, and J. LABELLE,

Defendants.

---

Plaintiff Anthony H. Turner, appearing pro se, is a prisoner at Fox Lake Correctional Institution (FLCI). Turner alleges that defendant prison officials have denied him blood-lead testing even though he was at increased risk of harm because of his high blood pressure and after he developed a rash that he believes was caused by the water. Defendants have filed a motion for summary judgment. Dkt. 48.

I will grant defendants' motion and dismiss the case because Turner fails to show either that the water caused his medical problems or that defendants consciously disregarded his problems.

UNDISPUTED FACTS

The following facts are undisputed unless otherwise noted. The parties also discuss issues related to this court's previous litigation about contaminants in the FLCI water; I have included some facts from my summary judgment decision in that case for background purposes. *See Stapleton v. Carr*, 438 F. Supp. 3d 925, 927 (W.D. Wis. 2020).

Anthony Turner has been housed at FLCI since 2012. Most of the defendants worked at FLCI during at least some of the events in question. Randall Hepp was the warden. Dylon

Radtke was the deputy warden. Candace Whitman was the health services manager. Julie Ludwig was a "nurse clinician 4." Laura Bartow was an institution complaint examiner. James LaBelle was employed by the DOC Bureau of Health Services as a regional nursing coordinator.

Drinking water sometimes contains small amounts of contaminants. People often obtain part of their needed intake of copper from their drinking water, but exposure to elevated levels of copper can be hazardous to human health.

Lead is hazardous to human health; according to the National Institute of Environmental Health Sciences, "No blood lead level is safe."[1] The United States Environmental Protection Agency (EPA) states that it "has set the maximum contaminant level goal for lead in drinking water at zero because lead is a toxic metal that can be harmful to human health even at low exposure levels. Lead is persistent, and it can bioaccumulate in the body over time."[2] But that zero-lead goal is not enforced by law. Drinking water regulations set by the EPA establishes "action limits," also known as "maximum contaminant levels," for metals including lead, copper, and arsenic.

Several times between 2008 and 2013, water testing at FLCI showed lead and copper concentrations that exceeded the EPA's action level for lead and other metals. In May 2014, the Department of Corrections entered into a consent order with the Wisconsin Department of Natural Resources (DNR) regarding the water quality at FLCI. Specifically, FLCI agreed to provide "public education" regarding the lead and copper action level exceedances, submit

[1]    National    Institute    of    Environmental    Health    Sciences,    *Lead*, https://www.niehs.nih.gov/health/topics/agents/lead/index.cfm.

[2] United States Environmental Protection Agency, *Basic Information about Lead in Drinking Water*, https://www.epa.gov/ground-water-and-drinking-water/basic-information-about-lead-drinking-water.

plans for cleaning, flushing, monitoring, and rehabilitation of the wells in the system, and obtain compliance with the lead and copper standards. In June 2015, a memorandum was posted in each housing unit stating that elevated levels of lead were found in the drinking water in some of the FLCI buildings, and that people with a variety of medical conditions, including high blood pressure, would be more susceptible to injury from the contaminated water.

The DOC took various efforts to remediate the contaminant problem, and in December 2016 the DNR "closed out" the consent order. After that, the lead and copper test results fell below the action levels, but they were not zero.

Turner states that he suffered diarrhea and stomachaches in the years after he arrived at FLCI but before he was aware of problems with the water. In 2015, a memorandum was posted in each housing unit stating that elevated levels of lead were found in the drinking water in some of the FLCI buildings, and that people with a variety of medical conditions would be more susceptible to injury from the contaminated water. Turner was instructed to run his water before drinking it, but even after running the water for a while it had a foul odor and it would not be clear. Turner was unable to afford bottled water or to boil his tap water.

In mid-January 2019, Turner submitted an "interview/information request" form addressed to Whitman, stating:

> Ms. Whitman could you please tell me why i can't have a test to show how much lead i have in my blood. one of your staff told me, they do not give out test for lead. I have been here at FLCI 12/18/2012 The water has been very dark and brown as of two weeks ago. the water smells and tastes like rust. I Think the water is affectin my health. I've a rasher on my chest and feeling nausea when i drink the water.

Dkt. 52-1, at 2.

Whitman directed defendant Nurse Ludwig to respond. Ludwig responded with the following memo:

> Your request for blood testing is denied at this time as any medical testing is ordered by the provider only when clinical evidence supports the need. The water has been deemed safe for consumption; therefore no evidence exists suggesting drinking the water will produce negative side effects on your health. Fox Lake Correctional Institution has worked extensively with the Department of Natural Resources (DNR) and outside contractors to improve the overall water quality throughout the institution. Due to the extensive progress made in correcting the issue, most recent tests have shown that the levels of copper and lead are well below the threshold. Providing bottled water is not a necessary action that the institution needs to take as we are providing an appropriate water source.
>
> We do encourage everyone to run the faucet 15-30 seconds prior to consuming it. I hope that you find this information useful.

*Id.* at 3.

Defendants say that this was the standard response when an inmate complained of a medical issue for which his providers had not already ordered lab work or other testing. It is undisputed that neither Whitman nor Ludwig could directly order a blood test for Turner. Ludwig also scheduled Turner to see a nurse for examination.

Several days later, Turner was seen by non-defendant Nurse Shannon for complaints of nausea and rash. Shannon conducted an examination and followed the dermatological nursing protocol. Shannon consulted with non-defendant Nurse Practitioner Radovich, who saw Turner's rash and ordered hydrocortisone cream for his face, triamcinolone cream for his chest, and clotrimazole for his feet and groin. Shannon noted that she would schedule Turner an appointment with an advanced care provider for hypertension and stomach issues. Turner agreed to record what he was doing, eating, and drinking when his nausea occurred. Defendants

say that Turner did not mention his desire for a blood test at this appointment; Turner says that he did ask for a blood test.

In late January, Turner filed an inmate grievance stating that the FLCI water was making him sick and asking to be tested for lead. Defendant complaint examiner Bartow contacted Whitman and asked her to provide a response to Turner's inmate complaint. Whitman reviewed Turner's medical record and found no order from a prescriber ordering a blood test for any heavy metals or any notes or documentation that suggested or supported that any of Turner's reported symptoms were linked to the drinking water. Whitman provided Bartow with nursing notes and correspondence explaining why they had previously denied him testing and showing that he had recently been seen by Shannon and Radovich.

Based on the documents and the information Bartow received from Whitman, she recommended that Turner's grievance be dismissed and she told Turner that he could file a health services request to address any further medical concerns he had. The reviewing authority dismissed the grievance and Turner lost his appeal.

In early February, Turner was seen by non-defendant Nurse Practitioner Denise Bonnett to follow up on his concerns of high blood pressure and upset stomach. During the appointment, Turner reported that he only drank bottled water because he did not feel the water was safe to drink. The parties dispute whether Turner asked for a blood-lead test. Bonnett assessed Turner with benign essential hypertension, for which she ordered a blood pressure medication, blood tests (although not a blood-lead test), and urine analysis. She assessed Turner with dyspepsia and ordered him an antihistamine and antacid. She also assessed Turner with prediabetes and advised him to monitor his sugars.

ANALYSIS

I granted Turner leave to proceed on the following Eighth Amendment claims:

- defendants Ludwig and Whitman refused to test his blood for lead even though he was at increased risk of harm because of his high blood pressure and he had developed a rash that he believes was caused by the water.

- defendants Hepp, Radtke, L. Bartow, and J. LaBelle denied his grievance about the refusal to test him for lead exposure.

The Eighth Amendment to the United States Constitution prohibits prison officials from consciously disregarding prisoners' serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976). A "serious medical need" is a condition that a doctor has recognized as needing treatment or one for which the necessity of treatment would be obvious to a lay person. *Johnson v. Snyder*, 444 F.3d 579, 584–85 (7th Cir. 2006). A medical need is serious if it is life-threatening, carries risks of permanent serious impairment if left untreated, results in needless pain and suffering, significantly affects an individual's daily activities, *Gutierrez v. Peters*, 111 F.3d 1364, 1371–73 (7th Cir. 1997), or otherwise subjects the prisoner to a substantial risk of serious harm, *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). A defendant "consciously disregards" an inmate's need when the defendant knows of and disregards "an excessive risk to an inmate's health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Snipes v. Detella*, 95 F.3d 586, 590 (7th Cir. 1996). However, inadvertent error, negligence, gross negligence, and ordinary malpractice are not cruel and unusual punishment within the meaning of the Eighth Amendment. *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996).

Turner's claims fail in part because he fails to show that his underlying health problems were caused by the water at FLCI. Turner is not a medical professional, so he is "not competent

to diagnose himself, and he has no right to choose his own treatment." *Lloyd v. Moats*, 721 F. App'x 490, 495 (7th Cir. 2017). In some medical care cases, it is obvious to a lay person that a plaintiff is correct in blaming a particular cause for his injuries. But here, Turner would need an expert to make the link between the contaminants and his maladies.

Pro se plaintiffs often seek recruitment of counsel when expert testimony might be necessary to prove their claims. Turner has not filed a motion for counsel on this issue, but if even he had, I would deny it. Given the dearth of willing counsel available to take pro bono cases, this court should not recruit counsel "if the plaintiff's 'chances of success are extremely slim.'" *Watts v. Kidman*, 42 F.4th 755, 766 (7th Cir. 2022) (quoting *Maclin v. Freake*, 650 F.2d 885, 887 (7th Cir. 1981). I consider it extremely unlikely that recruited counsel would be able to find an expert drawing a connection between the FLCI water and the seemingly unrelated medical problems that Turner had. And the court has already expended resources by appointing a medical and toxicology expert, Alfred Franzblau, to review the medical records of the numerous plaintiffs proceeding with their individual medical-care cases. *See Stapleton*, Case No. 16-cv-406-jdp, Dkt. 170 (W.D. Wis. Apr. 3, 2020). Franzblau's report does not support Turner's theory. Instead, Franzblau opines that it is unlikely that Turner suffered any acute or chronic toxic effects from the metals that Franzblau considered (arsenic, copper, lead, and manganese). And in particular, he stated that "it is unlikely that any of the 14 inmates [including Turner] has experienced any chronic symptoms or other chronic toxic effects . . . from ingestion of lead in the drinking water at FLCI during the time period in question." Dkt. 169-2, at 13. He came to this conclusion in large part because "the risk of chronic toxic effects related to lead (such as high blood pressure or cancer) is generally related to cumulative

(i.e., many years) or lifetime exposure to lead, and not brief episodes of over-exposure, such as those lasting for a few months, as in the situation at FLCI." *Id*. at 14.

The bottom line here is that Turner assumes that his rash and high blood pressure were caused by contaminants in the FLCI water. But his mere speculation that the water caused his injuries is not enough to create a disputed issue of material fact on that issue. *See, e.g.*, *Herzog v. Graphic Packaging Int'l, Inc.*, 742 F.3d 802, 806 (7th Cir. 2014) (While nonmovant "is entitled . . . to all reasonable inferences in her favor, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." (citation omitted)). Because Turner fails to show that his underlying health problems were caused by the FLCI water, he cannot show that he was harmed by defendants' actions or inactions.[3]

Turner also fails to show that defendants consciously disregarded his medical problems. I'll start with Turner's claim against defendants Ludwig and Whitman for failing to order him a blood test. It is undisputed that neither of them was authorized to directly order such testing. Nonetheless, they could still violate Turner's Eighth Amendment rights by blocking such a request or ignoring his requests for medical attention. But no reasonable jury could find that they did so.

---

[3] Defendants also suggest that Turner cannot show that he was harmed by the FLCI water because a July 2022 blood-lead test shows that Turner's blood-lead concentration was well within the normal reference range—Turner had a concentration of less than one microgram per deciliter. Dkt. 73-1. But drawing all reasonable inferences in Turner's favor, the July 2022 test does not prove anything about Turner's lead exposure during the events in question, occurring years prior. *See What is the Biological Fate of Lead in the Body?,* https://www.atsdr.cdc.gov/csem/leadtoxicity/biologic_fate.html# ("The half-life of lead in adult human blood has been estimated as 28 days.").

Whitman is not a front-line medical provider and she did not directly examine or treat Turner. She directed a front-line provider, Nurse Ludwig, to respond to Turner's information request about the water and a blood test. Ludwig in turn scheduled Turner to be seen by Nurse Shannon for the nausea and rash he was complaining about. Those are appropriate responses; no reasonable jury could conclude that they disregarded Turner's concerns.

Nor can Turner win claims directly regarding his dismissed grievance about blood-lead testing. Defendant complaint examiner Bartow dismissed Turner's grievance only after consulting with Whitman about Turner's medical records. Bartow, who is not a medical professional, was entitled to reasonably rely on the medical judgment of prison medical staff. *See Giles v. Godinez*, 914 F.3d 1040, 1049–50 (7th Cir. 2019). The fact that Bartow consulted with Whitman does suggest that Whitman could have done something to intervene in Turner's medical treatment if she thought it was appropriate to do so. But there is nothing in the record that could lead a reasonable jury to conclude that Whitman was aware of a risk of harm to Turner yet disregarded it. Whitman reviewed Turner's medical records and concluded that nothing in them suggested that the water was harming Turner or that he had been prescribed a blood test. And more generally, Whitman had been told that the FLCI water was safe to drink.

And it is undisputed that the other defendants Turner sues regarding the grievance process—Hepp, Radtke, and LaBelle—were not involved in reviewing his grievance or appeal. Turner suggests that defendant Hepp should be liable because as the warden he is responsible for the overall care of FLCI inmates. But high-level prison staff cannot be liable in their individual capacities under a theory of *respondeat superior*; they must be personally involved in the constitutional violation. *See Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988).

Because Turner fails to show that his medical problems were caused by the FLCI water or that defendants consciously disregarded his medical problems, I will grant defendants' motion for summary judgment and dismiss the case.[4]

One final point. Turner appears to attempt to expand the scope of this case in two respects, neither of which I will allow.

First, in Turner's summary judgment briefing he continues to refer to his Eighth Amendment and Wisconsin-law negligence claims about DOC staff exposing him to unsafe levels of contaminants in the FLCI water. But I dismissed those claims following my ruling in *Stapleton* dismissing claims about the conditions of FLCI inmates' confinement. Dkt. 17 and Dkt. 18. The only claims that I allowed Turner to proceed with in this case were his Eighth Amendment claims about the alleged lack of proper medical care, including the failure to arrange for blood-lead testing. And in any event, Turner's conditions-of-confinement claims would fail for the same reason that his medical-care claims do: there is no evidence that he was harmed by the FLCI water.

Second, in response to defendants' motion for summary judgment, Turner sought to amend his complaint to add as defendants Nurse Shannon and Nurse Practitioners Radovich and Bonnett. The court noted that Turner did not explain his allegations against these proposed new defendants or explain what good cause he had to amend his complaint so late in the proceedings; the court gave Turner a chance to supplement his motion to address these issues. Turner did not do so. Because Turner has not shown good cause for attempting to add

---

[4] Defendants also contend that they are entitled to qualified immunity on Turner's Eighth Amendment claims. Because I am dismissing Turner's claims on the merits, I need not consider defendants' qualified immunity argument.

these defendants so late in the proceeding or even submitted an amended complaint explaining his allegations against the proposed new defendants, I will deny his motion to amend his complaint. But based on the summary judgment record, even had Turner properly brought Eighth Amendment claims against Shannon, Radovich, and Bonnett, they would also fail because there is no evidence that he was harmed by the FLCI water and because the FLCI medical staff reasonably responded to his medical concerns and ensured that he received treatment for them.

ORDER

IT IS ORDERED that:

1. Plaintiff Anthony H. Turner's motion to amend his complaint, Dkt. 58, is DENIED.

2. Defendants' motion for summary judgment, Dkt. 48, is GRANTED.

3. The clerk of court is directed to enter judgment accordingly and close this case.

Entered March 20, 2023.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge